UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 1:12-CR-106 |
| v. ) | |
| ) | Judge Curtis L. Collier |
| GERMAN ROLANDO VICENTE-SAPON ) | |

**M E M O R A N D U M**

Defendant German Rolando Vicente-Sapon ("Defendant") filed a motion to suppress evidence in this case (Court File No. 16). The motion was filed after the deadline for such motions, but the Court allowed Defendant to file it out of time (Court File No. 20). However, the Court declined Defendant's request to continue the trial date in this case. Accordingly, the Court received evidence and heard arguments on Defendant's motion in the midst of trial. For the following reasons, Defendant's motion to suppress will be **DENIED** (Court File No. 16).

I. **RELEVANT FACTS**

The following facts are taken from the complaint (Court File No. 1). On August 10, 2012, agents with Homeland Security Investigations ("HSI") in Chattanooga were informed by Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") that Defendant, who had been administratively processed for removal from the United States and was being detained awaiting his removal order, could be federally prosecuted.

During Defendant's removal proceedings, numerous records were discovered including a restraining order filed against Defendant by the Department of Children's Services and a case report involving an investigation into possible sexual abuse by Defendant of his own daughter. The case report disclosed that Defendant was in a custody dispute with the child's mother, Yuria Vicente-Calel. Yuria is Defendant's first cousin. The case report detailed the circumstances by which he

paid for her to be smuggled to the United States and how he demanded sex from her before she was 18 years old. Yuria's birthday is September 5, 1989.

HSI agents interviewed Yuria, who explained her parents in Guatemala were forcing her to marry an older man, but she did not want to marry him. Defendant contacted her from Chattanooga and offered to bring her to the United States. He told her he would not force her to marry. She believed Defendant paid between $2,000 and $4,000 to a smuggler for her entry to the United States. This occurred in 2006 or 2007, when Yuria would have been between 16 and 18. Defendant contacted an individual at a Hispanic church in East Ridge, Tennessee who provided a telephone number for a human smuggler in Mexico. He paid $5,000 for the man to bring his cousin into the United States.

When she arrived, Defendant told Yuria she could not talk to anyone because there were many bad people and if she did she might get deported. He insisted she have sex with him because she was his wife. Although she did not want to, she eventually slept with Defendant because she had nowhere else to go and was illegally present in the United States. She claims she was 16 at the time.

On August 14, 2012, agents discussed these matters with Defendant. He informed them he contacted his cousin while she was in Guatemala and encouraged her to come to the United States, because she would have a better life and could earn more money for her sick mother, who was severely ill with diabetes. Defendant told agents he flirted with her during their conversations and the two became engaged over the phone. Defendant told agents he knew she was born in 1989 but did not know the day or month. He admitted he claimed her as his wife and had sex with her on the first night she stayed with him. The two were never legally married.

Defendant was indicted on August 28, 2012 and made his initial appearance before the Magistrate Judge on August 16, 2012. He was arraigned on the Indictment two weeks later. Defendant's trial was originally scheduled for November 5, 2012 but was moved to November 13, 2012. After the Final Pretrial Conference, Defendant filed an emergency motion for leave to file a motion to suppress (Court File No. 16).

Defendant moved to suppress the statements he made to HSI agents during the August 14, 2012 interrogation. Defendant argues the statements were not made voluntarily and that he was coerced into signing a *Miranda* waiver form. At trial the Court received the following testimony regarding the interrogation.

**A. Emma Comacho Saucedo**

Emma Comacho Saucedo ("Comacho") is employed with Language Services in Citizenship and Immigration Services within the Department of Homeland Security ("DHS"). She is a native Spanish speaker and has worked approximately nineteen years as a translator. She has worked at DHS for six years and worked for a number of years at the Drug Enforcement Agency before that. During the August 14, 2012 interview, Comacho provided translation services for the HSI agents and Defendant. She provided these services over the telephone. She testified that she had no recollection of the interview itself, but that she occasionally reported odd circumstances during translations if they occurred. She made no such report in this case.

**B. David Ryan Mullins**

Agent David Ryan Mullins ("Agent Mullins") is one of the HSI agents who interviewed Defendant on August 14th. He has worked at HSI for approximately nine years, and worked for Border Patrol for one and one-half years before moving to HSI. Agent Mullins testified to

understanding and speaking Spanish, which he learned while in Border Patrol Academy. Although Agent Mullins speaks Spanish, he used translator services for Defendant's interview. Agent Mullins informed the Court he determined the translator during this interview, Comacho, adequately translated his statements, questions, and Defendant's responses. Agent Mullins testified that when he began Defendant's interview, he explained he wanted to give Defendant the opportunity to tell his side of the story. At this point, Agent Mullins informed Defendant he could "possibly benefit" from their discussion, because the statements would be admissible in court and may help in his deportation proceedings, depending on what he said. Agent Mullins then advised Defendant of his *Miranda* rights, through Comacho, and simultaneously obtained a written waiver from Defendant in Spanish (Gov't Ex. 3). The waiver form contained sixteen sentences, all in Spanish, with Defendant's initials neatly inscribed next to each sentence. Defendant also signed the form at the bottom.

Agent Mullins had already interviewed Yuria, and much of Defendant's statement confirmed what Yuria had already told him. This included confirmation that he contacted Yuria in Guatemala, told her to come to the United States, made arrangements for her smuggling and paid smugglers, and that they had sex on her first day in the United States. Agent Mullins reported there were only minor inconsistencies between Yuria's and Defendant's stories, but he did not identify what those inconsistencies were. He described a casual interview and noted Defendant was willing and eager to answer. After the interview was over, Defendant shook Agent Mullins' hand and thanked him. Later that day, Defendant made a phone call at the Etowah County Detention Facility, during which he said the interviewers asked questions about his daughter and Yuria, and that he thought they were trying to stop his deportation.

**C. Ronald Appel, Jr.**

The government also called Agent Ronald Appel, Jr. ("Agent Appel"), the other HSI agent present during the interview. Agent Appel is the supervisor of HSI's Chattanooga area office. He has been in law enforcement nearly nineteen years, and understands some Spanish but does not speak it. Agent Appel's testimony corroborated Agent Mullins' testimony. He described the interview as casual and Defendant as very eager to speak with the agents. He was present for Defendant's *Miranda* warnings and identified Defendant's waiver form at the hearing.

**D. Defendant's Testimony**

After the government called its witnesses, Defendant took the stand. Defendant does not speak English, and required the use of a translator at trial and during the interrogation. He testified Agent Mullins told him he was there to talk to him and did not want him to be deported or to be separated from his family. Although Defendant admits signing the waiver form, he claims he was forced to sign it. Defendant testified that, while he was being read his *Miranda* warnings and listening to the translation, Agent Mullins was repeatedly yelling "Sign it, Sign it, Sign it!" and pointing at the form. Defendant did not remember whether this statement was translated, or whether he had heard it in English or Spanish. Defendant stated he began reading the form, but was unable to finish reading it because of Agent Mullins' insistence he sign the form.

Defendant also claimed he did not make all of the admissions Agent Mullins and Agent Appel testified he did. He claimed he did not say he called Yuria in Guatemala, but that he met her through his brother. He also denied telling the agents he paid Yuria's smuggler. He claimed he did not state he was aware of Yuria's age, but only that she was "close to 18 years of age" when she entered the United States. He did admit to stating he had sex with Yuria on the first day she arrived

5

in the United States. He claimed they spoke on her first night and she asked him if he wanted to be her husband. He answered affirmatively and they were intimate that night. Defendant testified to being generally nervous during the interview, because of the agents' demeanor, and felt forced to give testimony. He admitted to thanking Agent Mullins, but said he did so because he believed Agent Mullins would help with his deportation.

## II. DISCUSSION

Defendant raised two issues in his motion to suppress: (1) that his statements were not voluntarily given, and (2) that the translation of his statements was wrong or contained statements not attributable to him.

### 1. Voluntariness

With respect to the voluntariness of Defendant's statement, the Court must consider the totality of the circumstances and determine whether "the conduct of law enforcement officials is such as to overbear the accused's will to resist." *United States v. Redditt*, 87 F. App'x 440, 443-44 (6th Cir. 2003) (quoting *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994)). The Court must consider whether coercive activity occurred, whether Defendant's state of mind made him susceptible to coercion, and whether Defendant has established causation between the coercive activity and the statement. *Id.*

The only coercive activity alleged by Defendant is Agent Mullins' insistence Defendant sign the *Miranda* waiver form. Because the voluntariness of Defendant's statement is separate from whether he voluntarily waived his *Miranda* rights, the Court finds the agents' alleged conduct did not cause Defendant to give his statement. However, the Court also noted at the suppression hearing that Agent Mullins testified to informing Defendant he could "possibly benefit" from giving his side

6

of the story. To the Court, this appears to be, at worst, a promise of leniency. Promises of leniency do not necessarily render a statement involuntary. Such promises are only coercive if they are broken or illusory, that is, "a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action." *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003). However, "a statement about *possible* leniency is not generally impermissible." *United States v. Wiley*, 132 F. App'x 635, 640 (6th Cir. 2005) (citing *Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991)) (emphasis added). In this context, testimony at the suppression hearing suggests Agent Mullins informed Defendant, at the beginning of the interview, that if he was honest it was possible his statement could benefit him in a later proceeding, depending on the contents of the statement. The Court concludes Agent Mullins' statement was a statement about possible leniency. Accordingly, Agent Mullins' conduct was not sufficient to render Defendant's statement involuntary.

Aside from the conduct described above, no coercive activity is alleged by Defendant. Comacho, who has years of experience and has translated interrogations for law enforcement numerous times, did not note anything out of the ordinary in this interview. Moreover, Defendant admits he thanked both of the agents who interrogated him because he believed they would help him with his deportation proceedings. This is consistent with both Agent Mullins' and Agent Appel's testimony that Defendant was eager and willing to cooperate. Subsequent to the interview, Defendant made a telephone call in which he described the interrogation and expressed hope the agents would prevent his deportation. The totality of the circumstances suggests Defendant cooperated voluntarily with the agents, and freely provided a statement. Because the discussion of possible leniency was insufficient to render Defendant's statement involuntary, the Court concludes

7

Defendant's statement was given voluntarily.

However, this conclusion does not end the Court's inquiry. The Fifth Amendment protects a person from being compelled to incriminate him or herself. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A suspect who is in custody and subject to interrogation must be given *Miranda* warnings against self incrimination. *Miranda*, 384 U.S. at 467-68. Because of the pressures and psychological stress exerted on those in custody, officers of the law are required to adequately and effectively apprise such individuals of their rights and must fully honor their decision should they seek counsel before answering questions. *Id.* at 467. If an individual agrees to answer questions without counsel, the officer can then question the individual freely. *Davis v. United States*, 512 U.S. 452, 458 (1994). The government bears the burden of establishing a waiver by the preponderance of the evidence. *United States. v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)). A "waiver of *Miranda* rights must be voluntary, that is, 'the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *Id.* Such a waiver must also be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Daoud v. Davis*, 618 F.3d 525, 529 (6th Cir. 2010) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

The voluntariness inquiry for a *Miranda* waiver is the same as the test above. *Redditt*, 87 F. App'x at 445. However, the Court must now consider Defendant's contention the *Miranda* waiver was coerced because Agent Mullins repeatedly demanded he "Sign it, Sign it, Sign it!" and that he felt compelled to do so. Defendant's testimony on this matter, however, conflicts with the rest of the evidence presented. Defendant contends he does not speak English, but cannot remember whether the demands to sign the waiver were given in English or were translated into Spanish. He

8

contends the demands were made while the warnings were being read to him and simultaneously translated into Spanish. Then it would have been impossible for Agent Mullins' alleged demand to be translated as well. Defendant offered no explanation for how he could have understood Agent Millers' demands without them being translated into Spanish. Perhaps even more telling, Comacho did not remember or report anything that was unusual during the interview. Presumably, constant demands Defendant sign a waiver form while he was being read his *Miranda* rights would have given Comacho pause, and would likely have caused her to report the event to her superiors, as she testified she had done in the past. Defendant's claim also conflicts with his own account of the interview, in which he admitted he thanked the agents because he thought they would assist him in his deportation proceedings. Such a cordial relationship would be unlikely to follow the coercive demands alleged here. Lastly, the actual signature and initials on the waiver form were neatly printed, which suggests Defendant was not rushed to sign it. The Court finds Defendant's testimony regarding the *Miranda* waiver incredible, and finds his waiver was not coerced. For the reasons stated above, the Court again holds, under the totality of the circumstances, Defendant's waiver was voluntary.

The Court must also determine if Defendant's waiver was knowing, that is, whether the waiver was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Daoud*, 618 F.3d at 529. Here, Defendant was read his rights by Agent Mullins and the rights were translated into Spanish. Defendant was also provided a written version of the rights which he could read while the rights were being read to him. Although Defendant claims he did not in fact read them, the Court has already found his testimony incredible. Defendant did not indicate at any time during the interview he did not wish to waive his

rights. He initialed each line on the waiver form and signed at the bottom. Indeed, Defendant apparently believed his statement could help him avoid deportation. Defendant, then, apparently understood his statement could be used in other proceedings. The Court concludes, under the totality of these circumstances, Defendant waived his rights with a full awareness of the nature of the right and the consequence of abandoning it.

Defendant further argues his waiver was not valid because he does not understand English. He relies on *United States v. Short*, 790 F.2d 464 (6th Cir. 1986), in which the Sixth Circuit held a German-speaking defendant's statement was invalid. In that case, the defendant was not read her *Miranda* rights and gave incriminating statements. The court held these statements should have been suppressed because there was no probable cause to arrest her and no *Miranda* warnings were given. The following day the defendant produced a written statement, this time after receiving *Miranda* warnings. In determining whether this second confession was tainted by the first, the court noted her understanding of English was deficient and she had no knowledge of the American criminal justice system. Further, although the police carefully instructed the defendant on her *Miranda* rights, the court held this was insufficient because they were given in English. Her written statement, also in English, could hardly be said to be hers, and at best was the agent's interpretation of her broken English. Accordingly, the court found the government failed to establish the statements were given voluntarily.

While it is true that a language barrier is relevant in determining a valid waiver, this "determination is not difficult when a suspect is advised of his rights in a language he understands." *United States v. Barrena*, 1:07-CR-66, 2007 WL 5312565 (E.D. Tenn. Dec. 28, 2007) (Lee, J.) (quoting *United States v. Alaouie*, No. 90-1970, 1991 WL 144479, *4 (6th Cir. Aug. 1, 1991) (citing

*United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir.); *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir.1987)). Accordingly, because Comacho translated the *Miranda* warnings into Spanish for Defendant, his waiver was valid. *See Barrena*, at *8-9 (citing *United States v. Martinez*, 588 F.3d 1227 (9th Cir. 1978) (holding valid waiver even though *Miranda* warning was given in Spanish with a Mexican accent where the defendant spoke Spanish with a Cuban accent)).

The Court finds Defendant was not coerced into providing the August 14, 2012 statement. The Court also finds Defendant's *Miranda* waiver was given voluntarily and knowingly. Accordingly, Defendant's motion to suppress his statement will be **DENIED**.

**2. Translation**

With respect to the translation of Defendant's statement, the Court finds the translator effectively and accurately translated Defendant's statements and the agents' questions. Comacho has extensive experience translating for law enforcement, stating she had performed over two thousand translations over the phone. Moreover, Agent Mullins, who also speaks Spanish, testified to the accuracy of Comacho's translation. Due to the presence of two Spanish speakers during the course of the interview, and Comacho's extensive qualification and experience, the Court finds the translation accurately reflected Defendant's statements.

### III. CONCLUSION

For the foregoing reasons, the Court will **DENY** Defendant's motion to suppress (Court File No. 16).

**An Order Shall Enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**